Fayne DeAngelo PADILLA, and Christy Lee Padilla, his wife, Individually and as Parent and Natural Guardians of Elijah DeAngelo Padilla and Elisa Lee Padilla, Plaintiffs,

v.

Gregory MILLER, a Pennsylvania State Trooper, Defendant.

No. 3:97–CV–0873.

United States District Court, M.D. Pennsylvania.

April 9, 2001.

James A. Swetz, Cramer, Swetz & McManus, Stroudsberg, PA, for plaintiffs.

John G. Knorr, III, Michael L. Harvey, Office of Attorney General, Harrisburg, PA, for defendant.

## MEMORANDUM

VANASKIE, Chief Judge.

Following a one-day non-jury trial held on April 12, 1999, this Court, on November 17, 1999, issued a Memorandum opinion setting forth findings of fact supporting the conclusions that (1) defendant Pennsylvania State Trooper Gregory Miller violated plaintiffs' Fourth Amendment rights by the unreasonable detention and search of their vehicle during a traffic stop; and (2) Trooper Gregory Miller was not entitled to qualified immunity. It was also concluded, however, that plaintiffs failed to establish actual injury. Thus, they were awarded only nominal damages. In addition, because plaintiffs had not established that Trooper Miller had acted with evil motive or reckless indifference to their constitutional rights, punitive damages were denied. Consistent with these findings, judgment was entered in favor of each plaintiff in the amount of $1.00.

On November 29, 1999, the plaintiffs filed a motion to "Amend Findings, or to Make Additional Findings, and for Amendment of Judgment pursuant to Fed. R.Civ.P. 52(b) and 59, or in the Alternative, for a New Trial Limited to the Issue of Damages." Plaintiffs' motion challenges three aspects of the November 17, 1999 decision, all of which concern the relief to which they claim entitlement. First, plaintiffs contend that the Court

erred in holding that plaintiff Fayne DeAngelo Padilla could not recover damages for the period of time he spent in custody on charges of unlawful possession of the weapons and narcotics found during the unconstitutional search of the vehicle. Second, plaintiffs claim that they had established other compensable injury as a result of the violation of their Fourth Amendment rights. Finally, plaintiffs assert that punitive damages are warranted.

As to the first matter, I find that the Third Circuit's recent decision in *Hector v. Watt*, 235 F.3d 154 (3d Cir.2000), validates the conclusion reached in the November 17, 1999 Memorandum opinion:

"Victims of unreasonable searches or seizures may recover damages directly related to the invasion of their privacy—including (where appropriate) damages for physical injury, property damage, injury to reputation, etc.; *but such victims cannot be compensated for injuries that result from the discovery of incriminating evidence and consequent criminal prosecution.*"

*Id.* at 157 (emphasis added) *quoting Townes v. City of New York,* 176 F.3d 138, 148 (2d Cir.), *cert. denied,* 528 U.S. 964, 120 S.Ct. 398, 145 L.Ed.2d 311 (1999). Accordingly, Fayne Padilla is not entitled to recover damages from the point in time when he was placed under arrest based upon the discovery of guns and drugs in his car until he was released from confinement following a state court determination that the search of the vehicle and seizure of the evidence were unconstitutional.

Having also given careful consideration to the second matter raised by plaintiffs—whether they sustained actual injury as a result of the constitutional violations, I am now persuaded that each plaintiff is entitled to compensation for the period of time during which they were wrongfully detained. I remain convinced, however, that

plaintiffs failed to prove by a preponderance of the evidence that, following the traffic stop, they suffered emotional distress or mental anguish as a result of the unconstitutional detention and search.

Finally, having carefully considered again the question of punitive damages, I remain of the opinion that plaintiffs did not show that Trooper Miller acted with evil motive or callous indifference to their rights. Thus, the judgment will not be amended to impose exemplary damages against Trooper Miller.

## BACKGROUND

The November 17, 1999 Memorandum opinion set forth in separately numbered paragraphs 57 findings of fact pertinent to the claims raised by the parties. Notably, plaintiffs do not challenge the accuracy of any particular finding of fact.[1] Nor do the plaintiffs cite to a particular proposed finding of fact that they submitted in connection with this matter that was erroneously omitted from the findings made in the November 17, 1999 decision. Instead, they essentially request that the Court make additional findings of fact, not previously specifically requested, concerning compensable harm and punitive damages.[2]

To place plaintiffs' request for supplemental findings in proper perspective, and for the convenience of the reader, the findings of fact made in the November 17, 1999 Memorandum will be repeated verbatim. The evidence pertinent to plaintiffs' requested supplemental findings will then be addressed.

### Findings of Fact Made in the Court's November 17, 1999 Memorandum

#### A. The Parties

1. Trooper Gregory Miller was employed as a Pennsylvania State Police Officer on January 13, 1996. (Dkt. Entry 40, Defendant's Designation of Disputed and Undisputed Findings to Plaintiff's Original Findings of Fact and Conclusions of Law (D's Stmt of Facts) at 1.)[3]

2. Fayne DeAngelo Padilla is a resident of Springfield, Missouri who was born November 5, 1970. (April 12, 1999 Trial Transcript (Tr.), Dkt. Entry 42, at 22.)

3. Christy Padilla (formerly Christy Settles) is a resident of Springfield, Missouri. She was nineteen (19) years old and eight

---

1. For example, plaintiffs do not cite a particular finding of fact and then indicate the evidence in the record that contradicts that particular finding.

2. Plaintiffs' post-trial argument on compensable injury consisted entirely of the following:

   In a case arising under 42 U.S.C.A. § 1983, a Plaintiff must show injury before damages may be awarded. *Carey v. Piphus*, 435 U.S. 247, 257–58, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *Chatman v. Slagle*, 107 F.3d 380 (6th Cir.1997) (Motorist unlawfully searched and arrested entitled to damages). Fayne Padilla was incarcerated for an approximate 60 day period as a result of Trooper Miller's unlawful conduct. Likewise, Christy Padilla and the minor children were detained directly and derivatively. They are entitled to damages.

Plaintiffs offered no other argument as to what compensable injury was sustained as a result of the Fourth Amendment violation. (Brief in Support of Proposed Findings of Fact and Conclusions of Law (Dkt. Entry 46) at 18.) As to punitive damages, plaintiffs, without citation to authority, argued that the question should be considered "through the eyes of a reasonable *minority*." *Id.* at 19 (emphasis in original). Plaintiffs did not cite any evidence that served to undermine Trooper Miller's testimony that he believed his conduct was permissible under existing precedents.

3. Each side indicated which findings of fact proposed by the other side were disputed or not. Unless otherwise indicated, citation to a party's designation of disputed and undisputed findings signifies that the fact is not contested.

and a half months pregnant at the time of the incident in question. (Tr. at 94, 179.)

4. Elijah Padilla and Elisa Padilla are the minor children of Fayne and Christy Padilla who were in their company on January 13, 1996. (Tr. at 23–24, 94.)

## B. The Traffic Stop

5. On January 13, 1996, Miller was conducting a stationary patrol in a marked car on Interstate 80 in Monroe County, Pennsylvania. (D's Stmt of Facts at 1.)

6. Trooper Miller was accompanied by a dog trained to detect controlled substances. (*Id.*) He was dressed in a uniform distinctive to state troopers in charge of canine units.

7. At approximately 2:30 p.m., Trooper Miller stopped a vehicle bearing Missouri license plates for allegedly speeding and switching lanes without a turn signal. (*Id.;* Tr. at 175–76.) He directed the vehicle, operated by Fayne Padilla, to pull over at a rest stop on I–80.

8. Trooper Miller got out of his patrol car and approached the stopped vehicle on the passenger side and requested that the driver produce his license and registration. (D's.Stmt of Facts at 2.)

9. The driver of the car produced a valid Missouri driver's license in the name of Fayne D. Padilla and a Missouri identification card in the name of Fayne DeAngelo Padilla. (*Id.*)

10. The passenger, plaintiff Christy Padilla, identified herself as Christy L. Settles, of Springfield, Missouri.[4] (*Id.*)

11. Christy Padilla identified herself as the owner of the car and provided Trooper Miller with evidence of ownership. (*Id.*)

12. Christy and Fayne Padilla's two minor children, Elijah DeAngelo Padilla and Elisa Lee Padilla, were also passengers in the car. (*Id.*)

13. Trooper Miller advised Fayne Padilla of the reasons for the traffic stop and returned to the patrol car to write a warning for the violations and conduct a radio check of the license for the driver of the car. (*Id.;* Plaintiff's Response to Defendant Miller's Proposed Findings of Fact and Conclusions of Law (Plf's Stmt of Facts), Dkt. Entry 39, at 2; Tr. at 171.)

14. While writing the warning, Miller ran a National Crime Information Center (NCIC) check on Fayne Padilla. (Plf's Stmt of Facts at 2; Tr. at 171.)

15. Miller's NCIC check registered a hit, showing that Fayne DeAngelo Padilla, who was born November 5, 1970 and was identifiable by a scar on his chest, had been arrested for theft charges in Springfield, Missouri, including charges for the possession, manufacture and sale of illegal weapons. (Tr. at 171–72.) The NCIC check also indicated that Padilla had used as an alias the name of Paul Christopher Brown and a birth date of March 5, 1970. Under this alias, Padilla had been arrested for grand theft auto and possession, manufacture and sale of dangerous weapons. (Tr. at 172.)

16. Miller did not obtain any information that Padilla or someone matching his description was wanted in another jurisdiction or was a fugitive from justice. (Tr. at 172.)

17. After obtaining this information, Miller re-approached the car and asked Padilla to exit the car and Padilla complied. (D's Stmt of Facts at 2.) Padilla was instructed to move to the back of his vehicle, which was located in front of Miller's police car. (Tr. at 29, 173.)

---

4. Ms. Settles married Mr. Padilla after the incident in question. (Tr. 23.) For the purposes of this opinion she will be referred to as Christy Padilla.

18. Trooper Miller requested that Fayne Padilla lift his shirt in order to see if he could locate a scar on Padilla's chest. Miller did not tell Padilla why he wanted to examine Padilla's chest. (Tr. at 173.)

19. Miller could not find the scar and told Fayne Padilla to return to the car. (D's Stmnt. of Facts at 2.)

20. After making another radio inquiry, Miller once again approached the Padilla car from the driver's side and asked Padilla to step from the car and lift his shirt, explaining that he was looking for a scar so as to positively identify Padilla. Padilla complied. (*Id.;* Tr. at 174.) This occurred again between the state police cruiser and the Padilla vehicle (*Id.*)

21. Miller went back to the state police car and proceeded to write Padilla a traffic warning. (Tr. at 175.)

### C. The Detention of the Plaintiffs

22. Before Miller finished writing the warning, two other State Police Troopers, Powell and Semler, arrived in separate cars and parked behind Miller's car. Powell arrived before Semler. Semler arrived at approximately 3:00 p.m., about 30 minutes after Miller had stopped the Padilla vehicle (Tr. at 133–34, 144–45.)

23. When Semler arrived, Trooper Powell was standing with Padilla between the Padilla car and Miller's cruiser. Trooper Miller was still in his car, writing a warning to Padilla. (Tr. at 134, 158.)

24. Trooper Miller exited his car and gave the written warning to Padilla in the presence of Troopers Powell and Semler. (Tr. at 158.) Trooper Miller explained the contents of the warning to Padilla, who signed for his copy. (D.'s Stmt of Facts at 2.)

25. Trooper Miller then gave Padilla a copy of the warning and told Padilla he was free to leave. (*Id.*)

26. Before Padilla could get back in his car, Trooper Miller called to Padilla and said he wanted to ask Padilla some more questions. (Tr. at 34.) Miller instructed Padilla to return to the back of the car; Padilla complied. (*Id.*) At this time, Troopers Powell and Semler were still on the scene, standing near Trooper Miller's car. (Tr. at 158.)

27. Trooper Miller interrupted Padilla's departure to ask him some questions because he suspected that Padilla was engaged in some criminal activity. (Tr. at 177.) However, Trooper Miller had not observed any evidence of criminal activity and was satisfied that Padilla was not wanted in another jurisdiction. (Tr. at 217–18.) Trooper Miller's tone was authoritative, indicating to Padilla that Miller was not finished with him and that Padilla was not free to leave. (Tr. at 36, 40, 73.)

28. Miller asked Padilla about the origin, destination and duration of his trip. (D's Stmt of Facts at 2.) Padilla replied that he was driving from Springfield, Missouri to Long Island, New York to borrow $350 for rent from his aunt. Padilla stated that as soon as he obtained the money, they would return to Springfield. (Tr. at 178.)

29. While Fayne Padilla remained at the rear of the vehicle in the company of Troopers Powell and Semler, Miller approached the passenger side of the vehicle and asked Christy Padilla about the origin, destination and duration of the trip. She stated that they were going to the home of Padilla's aunt on Long Island and were to stay there until she had her baby. (Tr. at 179.)

30. Miller then returned to the rear of the car to ask Fayne Padilla a few more questions. (*Id.* at 179–180.)

### D. The Search of the Vehicle

31. After asking Fayne Padilla more questions, Trooper Miller asked Christy

Padilla, the owner of the car, if she would mind if he looked in the car. (Tr. at 236.) She said that she would not mind. (Tr. at 180.)

32. Trooper Miller never told Christy Padilla the purpose of the search, what he was looking for, or that he intended to search all vehicle compartments, including the trunk, and all containers in the car, such as luggage. (Tr. at 236–37.)

33. Trooper Miller searched under the driver's seat, and then searched under the passenger seat while Christy Padilla remained in the car. (Tr. at 180.) He removed from the front of the car a tote bag and Christy Padilla's purse, placing them on the top of the car. (*Id.*) After Christy Padilla consented to the search, Trooper Miller asked her if there was a trunk release in the passenger compartment of the car. She told him that there was, and Trooper Miller reached into the glove compartment and pushed a button that released the trunk. (Tr. at 122, 180; D's Stmt of Facts at 3.)

34. Trooper Miller then proceeded to search the trunk. In the trunk, he saw a nylon gym bag. He opened the gym bag and observed that it contained men's clothing. Fayne Padilla was still standing at the rear of the vehicle as Trooper Miller began to examine the contents of the gym bag. Trooper Miller did not ask Fayne Padilla for his consent to search the gym bag. (Tr. at 242–46.)

35. As Trooper Miller was examining the contents of Fayne Padilla's gym bag, Fayne Padilla informed Trooper Miller that Padilla was involved in some "despicable stuff," to which Miller responded by asking whether Fayne Padilla was a "snitch." (Transcript of State Court Habeas Corpus Proceedings (PX–5) at 14.) Fayne Padilla answered this inquiry in the affirmative. (*Id.;* Tr. at 181.)

36. Trooper Miller found in the gym bag a Glock 9 mm and a 380 semi-automatic pistol. He also found 50 rounds of 40 caliber ammunition and 31 rounds of 9 mm ammunition. (Tr. at 183.)

### E.  The Arrest of Fayne Padilla

37. Trooper Miller directed Fayne Padilla to remain at the rear of the vehicle while he returned to his patrol car to run a check on the guns found in Padilla's bag. (D's Stmt of Fact at 3; Tr. at 39–40, 184.) Upon learning that the weapons had been reported stolen, he arrested Fayne Padilla and placed him in handcuffs. (D's Stmt of Facts at 3; Tr. at 39–40; 184.)

38. Miller then asked him if there was anything else illegal in the car. Padilla told him that there was a small amount of marijuana in Christy Padilla's purse. Trooper Miller, without asking Christy Padilla for consent to search her purse, opened the purse and, after a brief search, found a small amount of marijuana. (Tr. at 40–42, 104–106, 184.)

39. Trooper Miller informed Christy Padilla that her husband was under arrest and would be taken to the State Police Barracks in Swiftwater, Pennsylvania. (Tr. at 185.)

40. Christy Padilla was not placed under arrest and was not handcuffed. (D's Stmt Of Facts at 3.)

41. Fayne Padilla was placed in Trooper Powell's state police car and taken to the Swiftwater, Pennsylvania State Police Barracks for processing. (Tr. at 186.)

42. Christy Padilla followed in her car with her two minor children. (D's Stmt Of Facts at 3.)

43. The roadside encounter took approximately one hour from the time of the stop (about 2:30 p.m.) until Troopers Miller, Powell and Semler left the scene with the Padillas (about 3:30 p.m.).

44. It was not until about 8:30 p.m., about five hours after Fayne Padilla was arrested, that Trooper Miller explained to Padilla the *Miranda* warnings. (Tr. at 250; DX–1.)

45. After acknowledging that he understood his *Miranda* rights, Fayne Padilla signed a written statement implicating himself in a narcotics trafficking conspiracy and admitting that the weapons and marijuana found in the search were in his possession. (DX–2)

46. Trooper Miller filed the following criminal charges against Fayne Padilla: receiving stolen property, possession of firearms not to be carried without a license, and possession of a controlled substance. (D's Stmt of Facts at 3–4.)

### F. Subsequent Events

47. After being instructed by Trooper Miller that it was time to go, Christy Padilla left the Swiftwater barracks. She stayed in a nearby hotel that night and proceeded to drive back to Springfield, Missouri, the next day, January 14, 1996. (Tr. at 114, 125; DX–5.)

48. Fayne Padilla was incarcerated in the Monroe County Correctional Facility as a result of his inability to make bail. (Tr. at 46.) He was placed on a suicide watch for his first four days of confinement. (Tr. at 48.)

49. Fayne Padilla, represented by Attorney William Sayer, filed in the Court of Common Pleas of Monroe County a petition for a writ of habeas corpus, seeking suppression of the evidence gathered and statements made at the scene of the traffic stop on January 13, 1996. (Tr. at 9–15; D's Stmt of Facts at 5; PX–5.)

50. An evidentiary hearing was conducted by the Honorable Jerome P. Cheslock on the habeas corpus petition on March 19, 1996. (PX–5.)

51. The only person to testify at the habeas corpus hearing was Trooper Miller. (Tr. at 16.)

52. In an Opinion and Order dated April 2, 1996, Judge Cheslock granted the petition for a writ of habeas corpus and suppressed all evidence seized as a result of the search conducted on January 13, 1996, as well as any statements made by Fayne Padilla after the search. (PX–4.)

53. As a consequence of the suppression ruling, Judge Cheslock ordered that Fayne Padilla's bail be reduced to release on recognizance status, and Fayne Padilla was released from confinement on April 4, 1996. (Tr. at 13, 48–49; PX–6.)

54. Upon release from confinement, Fayne Padilla returned to Springfield, Missouri by bus. (Tr. at 49.)

55. The Monroe County District Attorney's office appealed the Order granting the petition for writ of habeas corpus. (D's Stmt of Facts 4.)

56. The appeal was later withdrawn by the Monroe County District Attorney's office. (*Id.*)

57. When Trooper Miller voiced his opposition to the District Attorney's decision to withdraw the appeal of Judge Cheslock's decision, he was told that it was not his decision to make. (Tr. at 205–06.) Trooper Miller did not sign any of the pleadings and was not a named party to the appeal of Judge Cheslock's decision, which was filed by the Monroe County District Attorney's Office. (Tr. 19–20.)

### Evidence Pertinent to Plaintiffs' Requested Supplemental Findings

In connection with their request for additional findings of fact, plaintiffs point to a hand-written statement made by Christy Padilla in April of 1996, in which she asserts that, following her husband's arrest,

she "was very scared …." (Defendant's Exhibit ("DX")—5) at 4. She also related in this statement that, when it came time to leave her husband, she "was on the verge of a nervous breakdown," and was "very mentally distressed …." (*Id.* at 9–10) As to any lasting emotional harm, her statement related her feeling that "[t]his whole journey was an incredible nightmare and to this day every time I get in my car I have flashbacks of the day…." (*Id.* at 11). Significantly, although she was a witness at the trial in this case, Christy Padilla did not offer any testimony as to any emotional harm or mental anguish she experienced as a result of the unlawful detention and search that occurred on January 13, 1996.

As to Fayne Padilla's claimed emotional harm, plaintiffs point to his handwritten statement (DX–3) and the fact that he was placed on suicide watch for the first four days of his confinement following his arrest. Plaintiffs do not point to any evidence that attributes emotional distress to the indignation of the detention and search, as opposed to the fact of arrest on serious charges.

As to punitive damages, the only evidence referenced by plaintiffs is the testimony of Trooper Miller that it had been his normal practice in traffic stops to inquire of the vehicle operator whether he or she would mind answering a few questions after he returned to the operator his or her driver's license and the vehicle registration. Trooper Miller had testified that he believed that this approach was sanctioned by a Pennsylvania Supreme Court case. (Trial Transcript (Tr.) at 187–88.) He also testified that this technique had resulted in a number of arrests that survived constitutional challenges to the search and seizure. (Tr. at 256–59.)

## Standard of Review

Without requesting any specific factual finding, plaintiffs ask that additional findings of fact be made that would support an amendment of the judgment to include damages for the period of the wrongful detention, damages for emotional distress experienced after the detention ended, damages for Fayne Padilla's pretrial detention on weapons and narcotics possession charges, and exemplary damages. Plaintiffs' motion is made under Rules 52(b) and 59(a) of the Federal Rules of Civil Procedure.

Rule 52(b) of the Federal Rules of Civil Procedure, in pertinent part, provides that "[o]n a party's motion filed no later than ten days after entry of judgment, the court may amend its findings—or make additional findings—and may amend the judgment accordingly. The motion may accompany a motion for a new trial under Rule 59." Rule 59(a) of the Federal Rules of Civil Procedure provides, in pertinent part, that "on a motion for a new trial in an action tried without a jury, the court may open the judgment entered, take additional testimony, amend findings of fact and conclusions of law, and direct the entry of a new judgment."

█ "Factual determinations are correctable under Rule 52(b) if the district judge who heard the evidence believes that they are necessary, and capable of being made without the grant of a new trial." *United States Gypsum Co. v. Schiavo Brothers, Inc.*, 668 F.2d 172, 180 (3d Cir. 1981); *cert. denied*, 456 U.S. 961, 102 S.Ct. 2038, 72 L.Ed.2d 485 (1982). To prevail on a motion to amend or alter a judgment, or for a new trial, the movant must show that the motion is necessary to correct manifest errors of law or fact. *See Blackiston v. Johnson*, No. Civ. A. 91–5111, 1995 WL 563834, at *2 (E.D.Pa. Sept.21, 1995), *aff'd mem.*, 91 F.3d 122 (3d Cir.), *cert. denied*,

519 U.S. 953, 117 S.Ct. 368, 136 L.Ed.2d 258 (1996).

## DISCUSSION

### A. Damages for Fayne Padilla's Post–Arrest Incarceration

The issue that dominates plaintiff's post-judgment filings concerns Fayne Padilla's entitlement to damages for the period of time he was in custody as a result of his arrest on weapons and narcotics possession charges. Fayne Padilla insists that recovery for the time spent in pretrial detention is mandated because "but for" the unconstitutional search of his gym bag the evidence that formed the predicate for his arrest would not have been discovered.

In rejecting this contention following the trial, I found persuasive the reasoning of the Second Circuit in *Townes v. City of New York*, 176 F.3d 138 (2d Cir.), *cert. denied.*, 528 U.S. 964, 120 S.Ct. 398, 145 L.Ed.2d 311 (1999). In *Townes*, the plaintiff had been arrested on weapons and narcotics possession charges after a traffic stop of the taxicab in which he was a passenger. Although the trial court denied a motion to suppress the evidence concerning the handguns and drugs that were found during the search of the cab, an appeals court, after the plaintiff had plead guilty, found that the police did not have probable cause to make the traffic stop and search the taxicab. Accordingly, the conviction was vacated and the plaintiff was released from confinement. The plaintiff then brought a § 1983 action to recover compensation for his pre-arraignment detention, conviction and incarceration. The Second Circuit held that recovery was foreclosed because "the injury [plaintiff] pleads (a violation of his Fourth Amendment right to be free from unreasonable searches and seizures) does not fit the damages he seeks (compensation for

his conviction and incarceration)." *Id.* at 147.

Fayne Padilla contends that *Townes* is inapposite because plaintiff in that case had plead guilty to the charges, whereas Fayne Padilla had not been convicted. Fayne Padilla also contends that *Townes* is inconsistent with Pennsylvania law and the development of the law of constitutional torts since *Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). Padilla maintains that once the fact of wrongful seizure is established, liability attaches for any foreseeable harm unless caused "by an independent force or person sufficient in law to be a supervening cause." (Brief in Support of Post Judgment Motion at 9.) In advancing this argument, Padilla contends that it does not matter whether the constitutional tort committed in this case is analogized to the common law tort of false arrest, false imprisonment or malicious prosecution because, according to Padilla, Pennsylvania law "apparently did not subscribe to the discrete categories of damage which some jurisdictions allowed for each common law action to the exclusion of the other." *Id.* at 8.

Plaintiff's arguments are largely undercut by the Third Circuit's recent decision in *Hector v. Watt*, 235 F.3d 154 (3d Cir. 2000). In *Hector*, as in this case, the evidence upon which narcotics possession charges were based was suppressed prior to any trial. Thus, as in this case, the plaintiff in *Hector* did not stand convicted of any crime. The plaintiff in *Hector* brought his § 1983 action to recover bail bond expenses, counsel fees, and other costs incurred as a result of the prosecution. As in this case, the law enforcement officers were not entitled to qualified immunity. As in this case, the damages claimed by the plaintiff in *Hector* would not have been incurred "but for" the un-

constitutional detention and subsequent search. Contrary to the approach suggested by Padilla in this case, the Third Circuit indicated that it was important to consider the type of relief that was recoverable under the separate common law torts of malicious prosecution, false arrest and false imprisonment.[5]

Pertinent to this case, the Third Circuit in *Hector* explained that "false arrest or imprisonment, the only ... cause of action [besides malicious prosecution] under the common law that could apply to a wrongful arrest and its consequences, provides damages 'up until issuance of process or arraignment, but not more.'" 235 F.3d at 156. The court then explained:

> Given the Supreme Court's mandate that we look to similar common law causes of action, Hector appears to be on the horns of a dilemma. If his claim is categorized as being like false arrest, then his claim fails because false arrest does not permit damages incurred after an indictment, excluding all the damages he seeks. But if his claim is treated as resembling malicious prosecution, then he would face the problem that a plaintiff claiming malicious prosecution must

be innocent of the crime charged in the underlying prosecution. "Even if the plaintiff in malicious prosecution can show that the defendant acted maliciously and without probable cause in instituting a prosecution, it is always open to the defendant to escape liability by showing in the malicious prosecution suit itself that the plaintiff was in fact guilty of the offense with which he was charged." This requirement can bar recovery even when the plaintiff was acquitted in the prior criminal proceedings, for a verdict of not guilty only establishes that there was not proof beyond a reasonable doubt.

*Id.*

According to this reasoning, Padilla may recover damages for the period of incarceration occurring after his arraignment only under a malicious prosecution approach. *See* 1 Dan B. Dobbs, *The Law of Torts* § 39 n.2 (2001) ("Once a formal charge has been made and the plaintiff is confined by judicial order after arraignment, the false imprisonment is terminated and the claim for any remaining damages must ordinarily be one for malicious prosecution.").[6] In this case, as in *Hector*, plain-

---

**5.** False arrest and false imprisonment often overlap. *See Gagliardi v. Lynn,* 446 Pa. 144, 149, 285 A.2d 109 (1971). As explained in 1 Dan Dobbs, *The Law of Torts* 67 (2001):

> False arrest is a term that describes the setting for false imprisonment when it is committed by an officer or by one who claims the power to make an arrest. Although false arrest is not essentially different from false imprisonment, detention by an officer or one acting under color of law may also amount to a civil rights violation.

**6.** The difference between the types of damages recoverable in an action for false arrest or imprisonment and the damages available in a malicious prosecution case is attributable to the distinct interests the separate common law torts advance. As explained by the New York Court of Appeals:

> The action for false imprisonment is derived from the ancient common-law action of trespass and protects the personal interest of freedom from restraint of movement. Whenever a person unlawfully obstructs or deprives another of his freedom to choose his own location, that person will be liable for that interference ...
>
> The tort of malicious prosecution protects the personal interest of freedom from unjustifiable litigation. The essence of malicious prosecution is the perversion of proper legal procedures. Thus, it has been held that some sort of prior judicial proceeding is the sine qua non of a cause of action in malicious prosecution. Such a judicial proceeding may be either an evaluation by a Magistrate of an affidavit supporting an arrest warrant application, or an arraignment or an indictment by a Grand Jury.

tiff cannot satisfy the malicious prosecution requirement of innocence of the crime charged in the underlying prosecution. At trial, Fayne Padilla acknowledged that he did not own the weapons found in his car and had no license to transport them. He also admitted possession of the ammunition. It thus appears that Padilla was in fact guilty of the crimes charged, thereby foreclosing recovery for post-arraignment confinement under a malicious prosecution theory.

▮ Recovery of damages for the period of time between arrest and arraignment depends on the existence of probable cause for the arrest.[7] *Groman v. Township of Manalapan*, 47 F.3d 628, 636 (3d Cir.1995)("an arrest based on probable cause could not become the source of a claim for false imprisonment"); *Russoli v. Salisbury Twp.*, 126 F.Supp.2d 821, 852 (E.D.Pa.2000)("a claim for false imprisonment cannot be based on an arrest based on probable cause"); *Wagner v. Waitlevertch*, 2001 Pa.Super. 100, 2001 WL 305843, * 4 (2001)("The central issue in determining liability in a Section 1983 action based on a claim of false arrest is 'whether the arresting officers had probable cause to believe the person arrested had committed the offense'.") Probable cause "exists when the facts and circumstances are sufficient to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Id.* The existence of probable cause is based on the facts known by the arresting officer at the time of the arrest. *Calamia v. City of New York*, 879 F.2d 1025, 1032 (2d Cir.1989).

Probable cause for the decision to arrest Padilla on weapons and narcotics charges would be lacking only if the evidence found during the unconstitutional search of the vehicle was excluded. Padilla has not cited any authority to exclude such evidence. In *Hector*, the Third Circuit observed that there was no authority allowing recovery of items of damage that would not have been incurred but for an unconstitutional search because "the exclusionary rule was not part of the common law." 235 F.3d at 156. The Third Circuit also noted that one scholar has found "that a 'two-century tradition of civil damage actions in America' prohibited a plaintiff who was subject to an illegal search from collecting damages for any prosecution, conviction, and incarceration resulting from the search. The plaintiff was limited to damages for the search itself." *Id.* at 157 quoting Akhil Reed Amar, *The Constitution and Criminal Procedure* 27 (1997).[8]

*Broughton v. State*, 37 N.Y.2d 451, 456–57, 335 N.E.2d 310, 373 N.Y.S.2d 87 (1975). Where incarceration is attributable to a court directive, such as the establishment of bail and the inability of the plaintiff to satisfy the bail requirements, the plaintiff must establish an absence of probable cause for the detention. "[D]amages for false arrest should be limited to the period before arraignment since after arraignment the accused is no longer held as a result of the arrest but as a result of the intervening act of the arraigning Magistrate." *Id.* at 459, 373 N.Y.S.2d 87, 335 N.E.2d 310. *Accord, Montgomery v. DeSimone*, 159 F.3d 120, 126 (3d Cir.1998) ("A claim for false arrest, unlike a claim for malicious prosecution, covers damages only for the time of detention until the issuance of process or arraignment, and not more.").

7. Padilla was arraigned in the early morning hours of January 14, 1996, within about twelve hours after his arrest. He was then committed to Monroe County prison as a consequence of his inability to make bail. A claim for false imprisonment would end with his arraignment.

8. Professor Amar illustrated his point with the following hypothetical:

Police suspect identical twins, who live in identical, adjoining houses. Police search both equally with equal but insufficient justification. In twin Adam's house, they find

Indeed, the courts that have addressed the issue have uniformly concluded that the exclusionary rule is not applicable in a § 1983 action. *See e.g., Townes,* 176 F.3d at 145 ("the fruit of the poisonous tree doctrine cannot link the unreasonable seizure and search to Townes' conviction and incarceration because this evidentiary doctrine is inapplicable to civil § 1983 actions"); *Wren v. Towe,* 130 F.3d 1154, 1158 (5th Cir.1997), *cert. denied,* 525 U.S. 815, 119 S.Ct. 51, 142 L.Ed.2d 40 (1998). ("Exclusion of the evidence found by [the police] on the theory that they had no legal right to search the vehicle would, in effect, be an application of the exclusionary rule to this case. Such an application would be inappropriate. The Supreme Court has never applied the exclusionary rule to civil cases, state or federal."); *Jonas v. City of Atlanta,* 647 F.2d 580, 588 (5th Cir.1981) ("[T]he desired deterrent effect has been achieved by the suppression of evidence [obtained as a result of an illegal search and seizure] in state criminal proceedings. The criminal enforcement process, which is the concern and duty of defendants, has been thwarted. Given the deterrence obtained by, in effect, precluding criminal prosecution, we think that the additional marginal deterrence provided in this case by disallowing the use of the evidence at this civil trial would not outweigh the so-cietal cost of excluding relevant evidence and decreasing the possibility of obtaining accurate factual findings."); *Mejia v. City of New York,* 119 F.Supp.2d 232, 254 n. 27 (E.D.N.Y.2000)("The three subsequently seized portfolios are admissible in this action as evidence of probable cause, despite the fact that they were suppressed during Mr. Mejia's criminal trial, because the Fourth Amendment's exclusionary rule does not apply in civil actions, other than civil forfeiture proceedings."). Thus, under traditional common law principles, Padilla would not be entitled to recover damages for that period of time between his arrest and arraignment because his detention was then supported by probable cause.

Of course, the common law is only to be "the starting point, not the only consideration in analyzing a claim under § 1983." *Hector,* 235 F.3d at 157. In *Hector,* the court recognized that the Supreme Court's directive in *Carey v. Piphus,* 435 U.S. 247, 264–65, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)—that compensatory damages "must be considered with reference to the nature of the interest protected by the particular constitutional right in question"—restricted recovery in the Fourth Amendment context to damages directly related to the invasion of privacy that the Fourth Amendment is intended to protect. In this

---

nothing; in twin Bob's, the blood stained shirt. The shirt is introduced as evidence in Bob's murder trial, and he gets twenty years. Both Adam and Bob then bring independent civil actions for damages. The result: under traditional principles, Adam and Bob recover equal amounts. Bob does not recover more for his twenty years. The factual harms of seizure, evidentiary use, conviction, and sentence are not legally cognizable; only the prior unconstitutional search is.

*Id.* As another scholar has observed, "[i]t is the relation of wrong to injury—not merely the relation of act to injury—that justifies compensation." John C. Jeffries, Jr., "Damages for Constitutional Violations: The Relation of Risk to Injury in Constitutional Torts," 75 Va.L.Rev. 1461, 1469 (1989). Professor Jeffries further explains:

The limitation of constitutional tort liability to constitutionally relevant risks would ... measure damages by the kind of injury that the Fourth Amendment was designed to prevent. The victim of an unconstitutional search could recover damages for invasion of privacy. *Monetary compensation would not extend to harms flowing from the discovery of incriminating evidence and consequent criminal prosecution.*

*Id.* at 1475 (emphasis added.)

respect, the court in *Hector* expressly agreed with *Townes*—" '[v]ictims of unreasonable searches or seizures ... cannot be compensated for injuries that result from the discovery of incriminating evidence and consequent criminal prosecution.' " *Id., quoting Townes,* 176 F.3d at 148. The post-arrest damages Padilla seeks result from the discovery of incriminating evidence and the ensuing prosecution.

In his reply brief, Padilla asserts that "[t]he whole purpose of § 1983 is to deter police conduct," and that denial of compensation for post-arrest incarceration resulting from an unconstitutional search and seizure "defeats this purpose."[9] (Plaintiffs' Reply Brief at 5.) In *Hector,* the Third Circuit held that the additional deterrent effect of imposing substantial financial liability on law enforcement officers who violate Fourth Amendment rights did not warrant allowing the victim of an unconstitutional search to "continue to benefit from the exclusionary rule in his § 1983 suit and be relieved of defense costs from a prosecution that was terminated only because of the exclusionary rule." 235 F.3d at 158. As Judge Cowen in *Hector* explained:

> Despite these arguments supporting greater deterrence, ... there are a variety of policy concerns to weigh. One policy concern in our case is that the magnitude of the liability that Hector's theory would impose would often have very little to do with the seriousness of the Fourth Amendment violation. What is often obscured by the Fourth Amendment's prominent role in criminal proceedings is that, as *Townes* suggested, we judge the gravity of Fourth Amendment violations not by the probative val-

ue of the evidence uncovered, but by the degree of the privacy invasion.

\*     \*     \*     \*     \*     \*

> Because the case law makes clear that we should keep in mind the interests protected by the constitutional provision, and should weigh competing policies in deciding remedies for Fourth Amendment violations, we think it is reasonable to recognize that the liability Hector seeks under § 1983 could often have little relation to the seriousness of the Fourth Amendment violation.
>
> Our point is not that officers should be free from liability for invasions of privacy, or even for comparatively minor ones.... The point is that given the social importance of police enforcement, we think it is irresponsible to impose potential liability out of proportion to the errors committed.

*Id.* at 159, 160.

Although the injury for which recompense was sought in *Hector*—the costs of the bail bond and attorneys' fees in securing suppression of the evidence—is different and perhaps more remote than the harm for which Padilla seeks relief— post-arrest confinement, the rationale of *Hector* compels the conclusion that Padilla's harm is as non-compensable as was Hector's. *Hector* rejected the perverse result that the law breaker whose Fourth Amendment rights are violated recovers more than an innocent victim of the same unlawful search and seizure. The logical consequence of the argument presented in this case is that Fayne Padilla, who admittedly engaged in criminal conduct for which he was arrested, would recover much more than Christy Padilla, who was not shown to have violated any law, simply

---

**9.** Contrary to Padilla's assertion, the principal purpose of § 1983 is to compensate for harm caused by unconstitutional conduct. *Farrar v.*

*Hobby,* 506 U.S. 103, 112, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992).

because Fayne Padilla was arrested and placed in custody pending prosecution. As recognized in *Hector*, no common law authority supports the position advanced by Fayne Padilla in this case. Fayne Padilla already obtained a significant benefit by application of the exclusionary rule. Padilla cannot continue to benefit from the exclusionary rule in this § 1983 suit by obtaining relief for harm caused by "a prosecution that was terminated only because of the exclusionary rule." *Id.* at 158.[10]

As noted above, *Hector* explicitly embraced the rationale of *Townes*. Significantly, the court in *Townes* not only denied recovery for the costs of prosecution and post-conviction confinement, but also ruled that the plaintiff could not obtain "compensatory damages for his arrest and pre-arraignment detention." 176 F.3d at 149. In language that is particularly apropos here, the court explained:

> Although the common law tort of false arrest (or false imprisonment) allows plaintiffs to seek damages from "the time of detention up until issuance of process or arraignment, but not more," the existence of probable cause defeats any such claim. The individual defendants here lacked probable cause to stop and search Townes, but they certainly had probable cause to arrest him upon

discovery of the handguns in the passenger compartment of the taxi cab in which he was riding. *The lack of probable cause to stop and search does not vitiate the probable cause to arrest, because (among other reasons) the fruit of the poisonous tree doctrine is not available to a § 1983 claimant.*

> Ultimately, *Townes's* only possible damage claim would be limited to the brief invasion of privacy related to the seizure and initial search of his person.

*Id.* (emphasis added).

The Third Circuit's treatment of *Townes* refutes plaintiffs' assertion that *Townes* is outside the mainstream of developing constitutional tort law. As *Hector* was decided in the context of a search conducted by Pennsylvania law enforcement officers, *Hector* also compels rejection of Padilla's contention that Pennsylvania law is materially different than the New York law cited in *Townes*. Finally, the similar treatment of the exclusionary rule in *Hector* and *Townes* shows a consistent application of federal law to limit relief for a Fourth Amendment violation to redressing the invasion of privacy. *Hector* thus substantiates the conclusion reached in the November 17, 1999 Memorandum opinion

**10.** Padilla's argument that a denial of post-arrest damages would serve as a disincentive for law enforcement compliance with the Fourth Amendment ignores the fact that the express purpose of the exclusionary rule "is to deter—to compel respect for the constitutional guarantee in the only effective available way, by removing the incentive to disregard it." *Elkins v. United States*, 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). Justice Stevens, concurring and dissenting in *United States v. Leon*, 468 U.S. 897, 974 n. 28, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), opined that exclusion of evidence in a criminal case is preferable to a damage award in a civil case, explaining:

> For at least two reasons, the exclusionary rule is a better remedy than a civil action against an offending officer. Unlike the fear of personal liability, it should not create excessive deterrence; moreover, it avoids the obvious unfairness of subjecting the dedicated officer to the risk of monetary liability for a misstep while endeavoring to enforce the law. Society, rather than the individual officer, should accept the responsibility for inadequate training or supervision of officers engaged in hazardous police work.

> In this case, society has indeed borne the consequences of the Fourth Amendment violation by having well-founded charges against Fayne Padilla dismissed.

that Padilla is not entitled to post-arrest damages.

### B. Damages for the Fourth Amendment Violation

In denying plaintiffs' compensatory damages, I focused on the absence of evidence of post-detention effects fairly attributable to the invasion of privacy. I did not consider, however, the impact on the plaintiffs while they were being detained and the unlawful search was being conducted. Having carefully considered the matter again, I believe that it was error on my part not to award damages for the period of time during which plaintiffs' Fourth Amendment rights were violated.

■ Factors pertinent to a claim for damages for false imprisonment include the length and condition of the detention, the severity of any injuries inflicted by the police, the conduct of the police, including the use of force or insulting language or slurs, the amount of any lost earnings, humiliation, emotional distress, and injury to reputation. *See Peterson v. County of Nassau,* 995 F.Supp. 305, 322 (E.D.N.Y. 1998). Compelled detention understandably yields some measure of humiliation and indignation that is compensable. *See Hyde v. Small,* 123 F.3d 583 (7th Cir.1997) (jury awarded $500 for a three-hour detention).

■ In this case, plaintiffs were unlawfully detained for approximately one hour. No physical injury was sustained. While Trooper Miller conducted himself in an authoritative manner, there is no evidence that he was abusive or insulting. His conduct, however, did cause Christy Padilla to be frightened and Fayne Padilla to be nervous. Fayne Padilla suffered the indignity of having his chest examined on a cold winter day. The detention occurred at a public rest stop.

Plaintiffs are entitled to recover for the restrictions on their liberty, the interruption of their travel, the indignities they suffered, and the humiliation they endured. Given the fact that the compensable detention occupied but one hour, no physical injury was sustained, and Trooper Miller did not act in an abusive or insulting manner, the damage awards should not be substantial. I find that, given the greater indignity sustained by Fayne Padilla, he is entitled to a slightly larger award than any other plaintiff. Under the circumstances, I find that adequate compensation to Fayne Padilla is $3,000, and that an appropriate amount for Christy Padilla is $2,000. There is no evidence that either of the infants experienced any emotional trauma or sense of indignity as a result of Trooper Miller's conduct. Under these circumstances, Elijah and Elisa Padilla will each be awarded the sum of $500.

■ As to the claims of Fayne and Christy Padilla for emotional distress purportedly suffered after the detention ended, however, I find that plaintiffs have not carried their burden of proof. Although expert witness evidence is not required to sustain an award of emotional distress damages, *see Bolden v. Southeastern Pennsylvania Transportation Authority,* 21 F.3d 29, 35–36 (3d Cir.1994), emotional distress must still be proven. Thus, in *Gunby v. Pennsylvania Electric Co.,* 840 F.2d 1108, 1121–22 (3d Cir.1988), the court reversed a jury award of $15,000 for emotional distress and humiliation where the only evidence supporting the award consisted of the plaintiff's testimony that he was "very upset," felt he had "been done wrong" and thought he "had been treated unfairly" in being denied a promotion.

■ In this case, neither Fayne nor Christy Padilla testified as to any emotional harm resulting from the traffic stop and ensuing wrongful detention. Christy Pa-

dilla points to a handwritten statement she prepared in April of 1996, about three months after the search, in which she claims to experiencing a "flashback" to the January 13, 1996 event whenever she entered her car. This isolated statement is insufficient to show compensable emotional harm. Significantly, Christy Padilla offered no evidence of sleeplessness, anxiety, embarrassment or depression that typically accompanies long standing emotional distress.

■■■ Fayne Padilla refers to the emotional trauma he experienced while incarcerated. There is no evidence, however, that the mental anguish was attributable to the indignity of the Fourth Amendment violation, as opposed to the consequence of being imprisoned on charges supported by probable cause. Under these circumstances, Fayne Padilla is not entitled to an award of damages for emotional distress.

**C. Punitive Damages**

■■■ The Padillas argue that denial of punitive damages was an abuse of discretion, asserting that "it is hard to fathom a more egregious violation of rights in a traffic stop than Miller committed in this case short of beating the motorist and/or his passenger ala Rodney King." (Brief in Support of Post Judgment Motion at 12.) This sort of bombastic rhetoric does not substitute for the dispassionate evaluation of the evidence that a request for punitive damages demands.

Trooper Miller testified that he subjectively believed that his conduct fell within the parameters of a state Supreme Court decision. (Tr. at 187–88.) Plaintiffs did not present any evidence that, prior to January 13, 1996, a court or other review body had found that Trooper Miller had violated motorists' Fourth Amendment rights in the manner in which he conducted traffic stops. Plaintiffs' assertion that "[w]hat is

perhaps most frightening in this case is Miller's contention that the practice he used here is the practice he followed in numerous stops," (Brief in Support of Post–Judgment Motion at 12), is disingenuous. Trooper Miller's reference to his past practice was his routine of asking motorists if they would mind answering a few questions after the purpose of the traffic stop had been completed and he had informed the motorists that they were free to leave. This is not the kind of conduct that reflects a callous indifference to Fourth Amendment rights. Buttressing Miller's position was his uncontradicted testimony that arrests he had made following traffic stops had withstood Fourth Amendment challenges on a number of occasions prior to January 13, 1996. Under these circumstances, a factual predicate for an award of punitive damages was not presented.

**CONCLUSION**

For the reasons set forth above, plaintiffs' post-judgment motion will be granted in part. Compensatory damages for the harm sustained during the course of the wrongful detention of the plaintiffs will be awarded. In all other respects, plaintiffs' motion will be denied. An appropriate Order is attached.

**ORDER**

NOW, THIS ___ DAY OF APRIL, 2001, for the reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1. Plaintiffs' Post–Judgment Motion (Dkt. Entry 54) is **GRANTED IN PART AND DENIED IN PART.**

2. The Clerk of Court is directed to amend the judgment entered in this matter to reflect the following awards of compensatory damages:

Fayne DeAngelo Padilla — $3,000.00

Christy Lee Padilla — $2,000.00

Elija DeAngelo Padilla — $ 500.00

Elisa Lee Padilla — $ 500.00

3. The Clerk of Court is further directed to amend the judgment to vacate the award of nominal damages of $1.00 in favor of each plaintiff.

4. In all other respects, plaintiffs' Post–Judgment Motion is **DENIED.**